IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| VIVIMETRIX LLC | * | |
| 14233 Paradise Tree Drive | | |
| Orlando, Florida 32828 | * | |
| | | |
| Plaintiff | * | |
| | | |
| v. | * | Civil Case No.: |
| | | |
| MONUMENT TRADERS ALLIANCE, LLC | * | |
| 105 W. Monument Street | | |
| Baltimore, Maryland 21201 | * | |
| **Serve on:**  Nicole Sullivan | | |
| 14 W. Mount Vernon Place | * | **JURY DEMAND** |
| Baltimore, Maryland 21201 | | |
| | * | |
| Defendant | | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>VERIFIED COMPLAINT AND JURY DEMAND</u>

Plaintiff Vivimetrix LLC ("Vivimetrix") files this Verified Complaint and Jury Demand against Defendant Monument Traders Alliance, LLC ("MTA"):

### Nature of the Action

1.    This a civil action seeking damages and injunctive relief for breaches of contract and unfair competition. Plaintiff seeks permanent injunctive relief, imposition of a constructive trust for improperly acquired profits, as well as compensatory and punitive damages, interest, costs, and an award of attorney's fees.

### The Parties

2.    Plaintiff Vivimetrix is a Florida limited liability company with its principal place of business located at 14233 Paradise Tree Drive, Orlando, Florida 32828.

3.      Defendant MTA is a Maryland limited liability company with its principal place of business located at 105 W. Monument Street, Baltimore, Maryland.

## Jurisdiction and Venue

4.      This Court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 (diversity).

5.      This Court has personal jurisdiction over MTA, and venue in this District is proper, because MTA maintains its principal offices in Maryland and otherwise MTA by contract consented to the jurisdiction and venue.

## Facts Common to All Counts

6.      Vivimetrix is a technology company which, among other things, developed and provides a software service to detect financial market patterns and to forecast a set of market characteristics. Specifically, Vivimetrix provides the Vivimetrix Software Service, a web application that consists of Vivimetrix harmonic pattern recognition and prediction algorithm, web-based user dashboard interface, and web-based account management interface (the "Vivimetrix Software Service").

7.      MTA operates as a financial publisher and an online advisory service. MTA offers a few different subscription services for options traders, and, until recently, MTA's main offerings were trade recommendations and alerts based on market intelligence gathered by its trade experts.

8.      At all times relevant, MTA has maintained a Unique Resource Locator ("URL"), or webpage address, which describes the services offered by MTA.[1]

---

[1] See https://monumenttradersalliance.com/our-services/

9.      As of July 3, 2022, MTA specifically offered four (4) services: (1) The War Room, (2) Insider Matrix, (3) Trade of the Day Plus, and (4) Trade of the Day.[2] [3]

10.      On July 15, 2022, Vivimetrix and MTA executed a Software Service Agreement (the "Agreement"), which among other things, granted to MTA for fees to be paid on a monthly basis an Exclusive Financial Publishing Industry License to use the Vivimetrix Software Service in MTA's offerings to its subscribers/users. *See* Ex. 1 (Software Service Agreement). MTA agreed to pay monthly fees in accordance with the Agreement and Exhibit A attached thereto and incorporated therein by reference. *Id*.

11.      The Vivimetrix Software Service provides tracking of W and M based technical patterns that identify bullish or bearish moves in stocks. It allows users to track a set of symbols and be notified when a W or M pattern has been identified by the Vivimetrix Software Service's algorithm.[4] It also provides the ability to adjust parameters to indicate if a notification shall occur sooner or later based on a selected preference.

12.      The Vivimetrix Software Service's architecture, including, but not limited to, algorithms, functionalities, user interface and display and design, interworking of various components and modules, logic flows, databases, access methods, and supporting programs and systems, are maintained and described by Vivimetrix as confidential.

---

[2] See https://web.archive.org/web/20220703204014/https://monumenttradersalliance.com/our-services/

[3] As of July 3, 2022, MTA marketed the offerings as follows: "The War Room is a unique, game-changing, collaborative platform where an elite group of like-minded traders gather each trading day to offer insight, ideas and community—all with the same goal: to make winning trades[]"; "The Insider Matrix is an active and consistent research service designed to pinpoint the best opportunities in the market based on price action and insider buying activity [ ]"; "With Trade of the Day Plus, we'll give you our best-timed play every single week[ ]"; and, Trade of the Day is an "e-letter" issued and sent at the end of business days to subscribers to provide "a quick recap of one of the most important trades of strategies we're tracking." *Id*.

[4] "M" and "W" refer to technical analysis patterns used by traders. An "M" refers to a double-top pattern which implies that an upward trend has slowed down and is indicative of a bearish reversal. A "W" refers to a double-bottom pattern which signals a bullish price movement.

13.    Upon information and belief, prior to its relationship with Vivimetrix, MTA's only offerings were akin to bulletin boards and newsletters for day traders. Technical analysis undertaken by MTA's Head Trading Tactician Bryan Bottarelli ("Bottarelli") during that time was, in effect, done manually, whereby he tried to "zero-in" on two patterns (M and W patterns) which he used to consistently make money.

14.    Before the advent of the Vivimetrix Software Service, what Bottarelli wanted in an automated system "didn't exist." Indeed, in a YouTube video of the "Banyan Edge" podcast posted online on or about March 20, 2023, Bottarelli appeared as a guest and recounted the "really cool story" of meeting a founder of Vivimetrix, Aaron French, who had developed and used what was and is the Vivimetrix Software Service, whom Bottarelli stated had "nailed it!" by having developed "exactly what he was looking for."[5] Before the Vivimetrix Software Service, Bottarelli "[had not] been able to do this with anyone else." *Id*. During that podcast, another guest, Mike Carr, who described himself as a little bit of a market historian, noted that people had been trying, without success, to automate the M and W patterns since at least the early 1970s. Bottarelli acknowledged that the Vivimetrix Software Service is "crushing," it's "awesome," and that it's "a game changing, revolutionary piece of software that has withstood the test of time." *Id*. Bottarelli, Carr, and the host of the Banyan Edge podcast, lauded every aspect of what is and was the Vivimetrix Software Service. *Id*.

15.    Upon information and belief, both parties mutually drafted the Agreement, and each party was represented by legal counsel.

---

[5] See https://www.youtube.com/watch?v=uZF56fNiq-M (accessed Sept. 3, 2024). Bottarelli's story begins at about the 10:00 mark.

16.     Section 18 of the Agreement provides that the Agreement is governed by the laws of the State of Maryland, and that "[e]ach Party irrevocably consents to the exclusive jurisdiction and venue of the state or federal courts in Baltimore, Maryland for all disputes arising out of or relating these Terms or the Services that are heard in court (excluding arbitration and small claims court)." Ex. 1, §18.

17.     Section 5.2 of the Agreement provides the following:

*5.2 Prohibitions*

Licensee shall not, and shall not permit any other Person to:

(a)     rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Software Service to any third-party;

(b)     reverse engineer, disassemble, decompile, decode, or adapt the Software Service, or otherwise attempt to derive or gain access to source code of the Software Service, in whole or in part;

(c)     bypass or breach any security device or protection used for or contained in the Software Service or Documentation;

(d)     remove, delete, efface, alter, obscure, translate, combine, supplement, or otherwise change any trademarks, terms of the Documentation, warranties, disclaimers, or Intellectual Property Rights, proprietary rights or other symbols, notices, marks, or serial numbers on or relating to any copy of the Software or Documentation;

(e)     use the Software Service in any manner or for any purpose that infringes, misappropriates, or otherwise violates any Intellectual Property Right or other right of any Person, or that violates any applicable Law;

(f)     use the Software for purposes of:

(i)     benchmarking or competitive analysis of the software;

5

        (ii)     developing, using, or providing a competing software product or service; or

        (iii)    any other purpose that is to Licensor's detriment or commercial disadvantage;

    (g)    use (i) the Software or Documentation other than for the Permitted Use or in any manner or for any purpose or application not expressly permitted by this Agreement.

*Id.*, § 5.2.

18.    Section 7 of the Agreement provides the following:

7.    **<u>Software Service Ownership</u>**

Licensee acknowledges and agrees that, as between Licensee and Licensor, all rights titles and interests in the Software Service and any part or derivation thereof, including, without limitation, all rights to patent, copyright, trademark, trade name, trade secrets and all other intellectual property rights therein and thereto, and all copies thereof, in whatever form, including any written Documentation and all other material describing such Software Service, shall at all times remain solely with Licensor.

*Id.*, § 7.

19.    Section 9 of the Agreement provides the following:

9.    **<u>All Rights Reserved</u>**

All rights not expressly granted to Licensee are hereby reserved to Licensor. Licensee agrees and acknowledges that the Software Service and related Software are valuable and confidential intellectual property belonging solely to Licensor, and that Licensee has not purchased or been sold or granted any interest in the Software Service or related Software except as expressly provided herein.

*Id.*, § 9.

20.    Section 10 of the Agreement provides the following:

10.    **<u>Intellectual Property</u>**

Neither Party is granted any right or interest to the logos, copyrights, trademarks, marks, trade names or trade secrets (the "Intellectual Property") of the other Party. Neither Party may use the other Party's Intellectual property without express written consent of such Party. Any changes, additions, and enhancements in the form of new or partial programs or documentation as may be provided by Licensor under the maintenance and support services shall remain the proprietary property of Licensor.

*Id.*, §10.

21.    Section 12.4 of the Agreement provides the following:

12.4 Term Of Agreement

The initial term of this Agreement begins on the Effective Date and, unless terminated earlier pursuant to any of the Agreement's express provisions, will continue in effect until one year from such date (the "Initial Term"). This Agreement will automatically renew each year at the conclusion of the Term unless earlier terminated pursuant to this Agreement's express provisions or Licensee gives Licensor written notice if non-renewal at least 30 days prior to the expiration of the then-current term (each a "Renewal Term" and together with the Initial Term, the "Term").

This Agreement shall end on the last date of the selected subscription. Licensee, agrees to a term of one (1) year or the end date of the last signing Subscriber, whichever is latest. Licensor may modify the prices or fees for Services for each Renewal Term upon thirty (30) days' notice to Licensee; *provided, howeve*r, if Licensee does not agree to accept the new pricing, Licensee may terminate the affected Agreement without penalty within thirty (30) days of the date of such notice. Any continued use of the Software Service thirty (30) days after notice shall be deemed acceptance of the new pricing.

*Id.*, §12.4.

22.    Section 12.5 of the Agreement provides the following:

12.5 Material Breach

Other than a Payment Default, either party may immediately terminate this Agreement and any applicable Amendments issued hereunder in the event the other party commits a material breach of any provision of this Agreement that is not cured within fifteen

(15) days of written notice from the non-breaching party. Such notice by the complaining party shall expressly state all of the reasons for the claimed material breach in sufficient detail so as to provide the alleged breaching party a meaningful opportunity to cure such alleged breach and shall be sent to the contract person at the address listed in the heading of this Agreement (or such other address that may be provided pursuant to this Agreement) ("Notice"). If this Agreement is terminated as a result of Licensor's material breach of this Agreement, then Licensee shall be entitled to a refund of the pro rata portion of any prepaid subscription fees paid by Licensee to Licensor under this Agreement for the remaining terminated portion of the Term.

*Id.*, § 12.5.

23.     Section 12.6 of the Agreement provides the following:

*12.6     Legal Remedies*

Upon termination of this Agreement, full legal and equitable remedies shall remain available therefor, and Licensee shall not be excused from making payment due under this Agreement with respect to any period prior to the date of termination.

*Id.*, §12.6.

24.     Section 15 of the Agreement provides the following:

15.     **<u>Confidentiality</u>**

*15.1     Employees/Officers/Directors*

Licensee will, and will direct its employees, officers, directors, members, managers, agents and affiliates, to keep any document or other marked confidential, confidential at all times, to protect Licensor's proprietary rights therein, and not to disclose, disseminate or permit to be disclosed or disseminated any such information or materials to any person, except as expressly authorized hereunder to enable Licensee to carry out its obligations pursuant to this Agreement. Licensee will use the same degree of care to avoid disclosure or dissemination of any such confidential information as it employs with respect to its own information which it does not desire to have disclosed or disseminated.

[.     .     .]

15.3.    *Protection of Confidential Information*

As a condition to being provided with any disclosure of or access to Confidential Information, the Licensee shall:

(a) not access or use Confidential Information other than as necessary to exercise its rights or perform its obligations under and in accordance with this Agreement;

(b) except as may be permitted under the terms and conditions of this section, not disclose or permit access to Confidential Information other than to its Representatives who: (i) need to know such Confidential Information for purposes of the Licensee's exercise of its rights or performance of its obligations under and in accordance with this Agreement; (ii) have been informed of the confidential nature of the Confidential Information and the Licensee's obligations under this Section; and (iii) are bound by written confidentiality and restricted use obligations at least as protective of the Confidential Information as the terms set forth in this Section;

(c) promptly notify the Licensor of any unauthorized use or disclosure of Confidential Information and take all reasonable steps/use its best efforts/cooperate with Licensor to prevent unauthorized use or disclosure; and

(d) ensure its Representatives' compliance and be responsible and liable for any of its Representatives' non-compliance with, the terms of this Section.

Notwithstanding any other provisions of this Agreement, the Licensee's obligations under this Section with respect to any Confidential Information that constitutes a trade secret under any applicable Law will continue until such time, if ever, as such Confidential Information ceases to qualify for trade secret protection under one or more such applicable Laws other than as a result of any act or omission of the Licensee or any of its Representatives.

[.    .    .]

*Id.*, §15.

25.    Section 16 of the Agreement provides as follows:

9

> 16. **<u>Survival. Sections 7 (unless Licensee purchases the Software Service and Software as provided under Section 11), 12.3, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26. 27, 28, and this section 16 shall survive any termination or expiration of this Agreement.</u>**

*Id.*, §16.

26.    Section 26 of the Agreement provides as follows:

> 26. Equitable Relief. Each Party acknowledges and agrees that a breach or threatened breach by such Party of any of its obligations under Section 15 would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity, or otherwise.

*Id.*, §26.

27.    In or about November 2022, MTA started actively offering to its users the services or utilities provided by the Vivimetrix Software Service.

28.    Indeed, on or about December 6, 2022, MTA's "Our Services" URL provided a hyperlink—and only a link—to access and use the Vivimetrix Software Service, which MTA identified as its "ProfitSight" service.[6]

29.    What MTA describes as its "ProfitSight" service was, and is, the W and M pattern tracking software—the Vivimetrix Software Service—made available to MTA during the term of the Agreement.

---

[6] See https://web.archive.org/web/20221206103159/https://monumenttradersalliance.com/our-services/

30.     In December 2022, Vivimetrix prepared their first invoice to MTA for their use of the Vivimetrix Software Service. MTA advised Vivimetrix that MTA would prefer to report their own user counts to Vivimetrix and have Vivimetrix use those counts for billing calculations, instead of using Vivimetrix's own data.

31.     Vivimetrix acquiesced to MTA's billing or reporting requests, because Vivimetrix trusted that MTA would act in good faith and, otherwise, Vivimetrix would always be able to ensure the accuracy of MTA's reports based on the actual state of the user records created in Vivimetrix's database. Indeed, for many months there were no inconsistencies.

32.     Unbeknownst to Vivimetrix, not long after providing a hyperlink for its users to access the Vivimetrix Software Service, and as early as January 30, 2023, MTA began describing "ProfitSight" as follows:

> **Our proprietary** ProfitSight software will equip you with the ultimate market-leading superpower in the palm of your hand. If you want to make money trading the market—every single day—all you need to do is log in to ProfitSight and follow the timing triggers. It's really that simple.[7] [8]

33.     On or about August 8, 2023, Bottarelli and MTA's Associate Publisher Ryan Fitzwater ("Fitzwater") produced and posted to the MTA website a 1-hour video demonstrating what it described as "MTA's First-Ever AI Powered Trading Tool."[9] MTA's "AI Powered Trading Tool" was, and is, the Vivimetrix Software Service.

---

[7] https://web.archive.org/web/20230130075727/https://monumenttradersalliance.com/our-services/(emphasis added).
[8] The word "proprietary", as an adjective, means "belonging to ownership; belonging or pertaining to a proprietor; relating to a certain owner of proprietor" Black's Law Dictionary 1384 (rev. 4th ed., West 1968).

[9] https://monumenttradersalliance.com/profitsight-demo-2023/

34.    Problems and inconsistencies in reporting began in or about November 2023, when MTA's first users of the Vivimetrix Software Service (described by MTA as its own "ProfitSight") were expected to renew.

35.    Beginning in December 2023, MTA began to slow-pay, short-pay, or not pay at all, the monthly fees it incurred and was obligated to pay under the Agreement.

36.    As of April 1, 2024, MTA owed Vivimetrix $518,584.71 pursuant to the terms of the Agreement.

37.    In April 2024, MTA stopped paying Vivimetrix the monthly fees MTA incurred and was obligated to pay under the Agreement.  Yet MTA's users continued to use the Vivimetrix Software Service, and MTA continued to receive the benefits of the service and of the Agreement.

38.    On June 15, 2014, Vivimetrix received from Fitzwater its notice of non-renewal which, in pertinent parts, provides as follows:

> Dear Vivimetrix Team,
>
> After a great run with the software, Monument Traders Alliance has decided to not renew our next contract term that is set to renew 7/15/24.
>
> Per section 12.4 term of our contract agreement, we need to give you 30 -day notice before our next contract renewal.
>
> This letter is to tell you we do not plan to renew.
>
> We wish you the best on future endeavors. And hopefully down the road we can find a new project to work together.

39.    On July 10, 2024—less than thirty (30) days after notifying Vivimetrix that it would not renew the Agreement, and before expiration of the Agreement—MTA began actively routing internet traffic of its users of the Vivimetrix Software Service away from

the Vivimetrix servers to either MTA's own servers, or to a third-party's servers, to MTA's "updated" and nearly identical version of its "ProfitSight."

40.    In July 2024, MTA began to aggressively market the "ProfitSight" service, and in an online posting on July 12, 2024—again, before the expiration of the Agreement—Bottarelli advised members of an MTA bulletin board of the following:

> Send P$ Q's to the mods. Ryan and I plan to film a demo very soon…which will detail the new benefits and features. So, stay tuned for that! As soon as our beta-test phase is complete—and the new features are fully operational—we'll record our demo. Just give us a 1-2 more weeks to get it all finalized, ok?

41.    On July 15, 2024—the date after which the Agreement would expire—Benjamin Dressing ("Dressing"), Senior Product Manager at MTA, posted to the MTA website a video entitled ProfitSight Quick Start which Dressing described as a quick walkthrough of "[MTA's] ProfitSight upgrades."[10]

42.    Upon information and belief, on July 22, 2024, MTA held a live online walkthrough and demonstration of MTA's new "ProfitSight."

43.    Despite demand, MTA has failed and refuse to pay Vivimetrix the amountsdue and owing pursuant to the Agreement. The current amount due and owing pursuant to the Agreement is $631,085.52.

44.    Upon information and belief, MTA stopped paying Vivimetrix for its service, because MTA was using the money it could have used to pay Vivimetrix to fund a scheme by which MTA and third-party software developers did, among other things, misappropriate, reverse-engineer, and use for benchmarking, the Vivimetrix Software Service to MTA's competitive and commercial advantage, and by which MTA did itself or

---

[10] https://monumenttradersalliance.com/profitsight/profitsight-quick-start/

with a third-party developer, "create" a competing service which continues to be identified by MTA as its "ProfitSight."

45.    Rolled out in July 2024, MTA's "upgraded" "ProfitSight" is in every way nearly identical in structure and functionality to the Vivimetrix Software Service. Examples abound of shameless displays of the same M and W patterns as the Vivimetrix Software Service has been doing since it launched, which displays reveal, among other things, MTA's reverse-engineering and impermissible use of and access to the Vivimetrix Software Service.

46.    Even the language relating to the subscription services offered by MTA are nearly identical to those contained in Exhibit A attached to the Agreement.

47.    Vivimetrix's Level One service provides: "Basic Access to 5 present index trackers (QQQ, SPY, INDU, GLD, Flex Trend Pick – hand selected by Bryan) and up to 5 hand selected symbols (mix and match as you choose!). *See* Ex. 1, §2 of Ex. A. Vivimetrix's Level Two service provides: Warrior Access to 5 preset index trackers (QQQ, SPY, INDU, GLD, Flex Trend Pick—hand selected by Bryan) and up to 25 hand selected symbols (mix and match as you choose!). *Id*.

48.    For an annual fee of $3,000, MTA's Level One "Basic Access" service provides: "Five present index trackers (QQQ, SPY, DIA, GLD, "Flex Trend Pick" hand-selected by Bryan) Up to five hand-selected symbols (mix and match as you choose!)" For an annual fee of $4,000, MTA's Level Two "Warrior Access" service provides: Five present index trackers (QQQ, SPY, DIA, GLD, "Flex Trend Pick" hand-selected by Bryan) Up to 25 hand-selected symbols (mix and match as you choose!)."[11]

---

[11]https://secure.monumenttradersalliance.com/journey/LAUNCHTO3000RETAIL/1?promoCode=WWNMYC03&origin=MTAWEB&origin_type=web&organization-abbreviation=OXC (accessed August 29, 2024).

**COUNT I**
**UNJUST ENRICHMENT**
**(Against MTA)**

49.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

50.     MTA benefitted from the Vivimetrix Software Service.

51.     MTA was well-aware of, and had knowledge of, the benefits of the Vivimetrix Software Service.

52.     MTA is withholding its payment to Vivimetrix for the benefits gained from the Vivimetrix Software Service.

53.     It would be inequitable for MTA to have benefitted from the Vivimetrix Software Service without payment.

54.     Vivimetrix has suffered damages in an amount exceeding $631,085.52, plus interest accruing thereon in accordance with the Agreement.

WHEREFORE, Plaintiff respectfully asks this Court:

- Enter judgment against Defendant for compensatory damages in an amount more than $631,085.52, plus interest, and the costs of this action; and

- Grant any other such relief that it sees fit.

**COUNT II**
**BREACH OF CONTRACT—PAYMENT OBLIGATIONS**
**(Against MTA)**

55.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

56.     Pursuant to the Agreement executed by and between Vivimetrix and MTA, and specifically pursuant to Section 4 thereof and Exhibit A attached thereto, MTA was and is contractually obligated to pay Vivimetrix $631,085.52.

57.    MTA's failure and refusal to pay Vivimetrix $631,085.52 is a material breach of the Agreement.

58.    Section 4.4(b) of the Agreement provides that "[MTA] shall reimburse [Vivimetrix] for all reasonable costs incurred by [Vivimetrix] in collecting any late payment of amounts due or related interest, including attorneys' fees, court costs, and collection agency fees." Ex. 1, §4.4(b).

59.    As a result of MTA's material breach of the Agreement, Vivimetrix has suffered damages in the amount of $631,085.52, plus interest accruing thereon in accordance with the Agreement, costs, and attorneys' fees.

WHEREFORE, Plaintiff respectfully asks this Court:

- Enter judgment against Defendant for compensatory damages in an amount more than $631,085.52, plus interest, and the costs of this action; and

- Grant any other such relief that it sees fit.

## COUNT III
## BREACH OF CONTRACT—USE OBLIGATIONS
### (Against MTA)

60.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

61.    Pursuant to the Agreement executed by and between Vivimetrix and MTA, MTA was and is contractually obligated to not use or allow the use of the Vivimetrix Software Service in a manner or for purposes not expressly permitted by the Agreement.

62.    Upon information and belief, during the term within which it had access to and use of the Vivimetrix Software Service, MTA materially breached the Agreement by developing a competing software product or service.

63.     Upon information and belief, during the term within which it had access to and use of the Vivimetrix Software Service, MTA materially breached the Agreement by lending, distributing, publishing, or otherwise making available the Vivimetrix Software Service to an unauthorized third-party.

64.     Upon information and belief, during the term within which it had access to and use of the Vivimetrix Software Service, MTA materially breached the Agreement by reverse-engineering the software to develop a competing software or service.

65.     Upon information and belief, during the term within which it had access to and use of the Vivimetrix Software Service, MTA materially breached the Agreement by providing to third-parties access to and use of the Vivimetrix Software Service for unauthorized and impermissible purposes of reverse-engineering and of attempting to derive or gain access to the source code of the Vivimetrix Software Service.

66.     Upon information and belief, during the term within which it had access to and use of the Vivimetrix Software Service, MTA and its directors materially breached the Agreement bypassing and/or breaching security devices of protections used for or contained within the Vivimetrix Software Service or Documentation.

67.     Upon information and belief, during the term within which it had access to and use of the Vivimetrix Software Service, MTA materially breached the Agreement by using the Vivimetrix Software Service in a manner or for a purpose that infringed, misappropriated, or otherwise violated Vivimetrix's interests and rights in the Vivimetrix Software Service.

68.     Upon information and belief, during the term within which it had access to and use of the Vivimetrix Software Service, MTA materially breached the Agreement by

using the Vivimetrix Software Service to Vivimetrix's detriment or commercial disadvantage.

69.    Upon information and belief, during the term within which it had access to and use of the Vivimetrix Software Service, MTA materially breached the Agreement by using the Vivimetrix Software Service and Documentation in a manner or for purposes not expressly permitted by the Agreement.

70.    As a result of MTA's material breaches of the Agreement, Vivimetrix has suffered damages in an amount exceeding $631,085.52.

WHEREFORE, Plaintiff respectfully asks this Court:

- Enter judgment against Defendant for compensatory damages in an amount more than $631,085.52, plus interest, and the costs of this action; and

- Grant any other such relief that it sees fit.

**COUNT IV**
**BREACH OF CONTRACT—CONFIDENTIALITY**
**(Against MTA)**

71.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

72.    Pursuant to the Agreement executed by and between Vivimetrix and MTA, MTA acknowledged that the Vivimetrix Software Service and related software are valuable and confidential intellectual property belonging solely to Vivimetrix and, as such, MTA and its employees/officers/directors were and are contractually obligated to, among other things, "keep any document or other marked as confidential, confidential at all times, to protect [Vivimetrix's] proprietary rights therein, and not to disclose, disseminate or permit to be disclosed or disseminated any such information or materials to any person, except as

expressly authorized hereunder to enable [MTA] to carry out its obligations pursuant to [the] Agreement." Ex. 1, §15.1.

73.     Upon information and belief, MTA materially breached the Agreement by reverse-engineering the Vivimetrix Software Service, by its impermissible use of and access to the Vivimetrix Software Service, and by its disclosure and dissemination of confidential information to third-parties for the purpose of developing a competing software product or service.

74.     As a result of MTA's material breaches of the Agreement, Vivimetrix has suffered damages in an amount exceeding $631,085.52.

WHEREFORE, Plaintiff respectfully asks this Court:

- Enter judgment against Defendant for compensatory damages in an amount more than $631,085.52, plus interest, and the costs of this action; and

- Grant any other such relief that it sees fit.

## COUNT V
## UNFAIR COMPETITION
### (against MTA)

75.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

76.     Unfair competition is "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort". *Elecs. Store, Inc. v. Cellco P'ship*, 127 Md. App. 385, 407, 732 A.2d 980, 991 (1999) (quoting *Baltimore Bedding Corp v. Moses*, 182 Md. 229, 237, 34 A.2d 338, 342 (1943)). "What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception." *Baltimore*

*Bedding Corp*. at 237, 34 A.2d 338. With regard to unfair competition, the Appellate Court of Maryland has noted: "'The legal principles which are controlling here are simply the principles of old-fashioned honesty. One man may not reap where another has sown, nor gather where another has strewn.'" *GAI Audio of New York, Inc. v. Columbia Broadcasting Sys., Inc*., 27 Md. App. 172, 192, 340 A.2d 736 (1975) (quoting *J. I. Case Plow Works v. J .I. Case Threshing Mach. Co*., 162 Wis. 185, 155 N.W. 128, 134 (1915)).

77.     As early as January 2023, during which time MTA began marketing the Vivimetrix Software Service, MTA began marketing the Vivimetrix Software Service on the MTA website as its own proprietary ProfitSight software service.

78.     Upon information and belief, discovery will reveal that in 2023 through July 15, 2024, and in clear violation of the Agreement, MTA developed a competing trading software service in-house or with third-party software developers by misappropriating, reverse engineering, and using for benchmarking purposes, the Vivimetrix Software Service during the term within which MTA had access to and use of the Vivimetrix Software Service.

79.     After the competing trading software was near completion or in beta-testing, MTA decided it no longer needed to renew the Agreement with Vivimetrix.

80.     MTA now provides to users a software service which directly competes with the Vivimetrix Software Service.

81.     MTA's development of a competing trading software service in-house or with third-party software developers by misappropriating, reverse engineering, and using for benchmarking purposes, the Vivimetrix Software Service during the term within which

MTA had access to and use of the Vivimetrix Software Service, are unfair methods of competition by which MTA has damaged and jeopardized Vivimetrix's business.

82.    As a result of MTA's unfair methods by which it now competes with Vivimetrix Software Service, Vivimetrix has suffered damages exceeding $75,000.00.

WHEREFORE, Plaintiff respectfully asks this Court:

- Enter judgment against Defendant for compensatory damages in an amount more than $631,085.52, plus interest, and the costs of this action; and

- Grant any other such relief that it sees fit

## COUNT VI
## FRAUDULENT CONCEALMENT
### (against MTA)

83.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

84.    MTA and Vivimetrix were bound by the Agreement, which created a contractual obligation requiring MTA to disclose material facts related to the use of the Vivimetrix Software Service.

85.    MTA deliberately concealed its intent and knowingly failed to disclose to Vivimetrix its use of Vivimetrix Software Service for purposes beyond the agreed terms, including, but not limited to, misappropriating, reverse engineering, and using for benchmarking purposes the Vivimetrix Software Service, and developing its "ProfitSight." Indeed, when executing the Agreement on July 11, 2022, Fitzwater and MTA made specific promises, including, but not limited to, those made at Sections 5 and 15 of the Agreement, with a present intention not to perform them.

86.    MTA misrepresented its true intentions by continuing to use the Vivimetrix Software Service while working to replicate and replace it unbeknownst to Vivimetrix.

87.    Vivimetrix relied on MTA's representations and believed the Vivimetrix Software Service was being used solely for the purposes outlined in the Agreement.

88.    MTA's concealment of its actions *supra* were material facts, crucial to Vivimetrix's decision to continue the Agreement and maintain the business relationship.

89.    As a result of MTA's concealment, Vivimetrix has suffered damages exceeding $75,000.00.

WHEREFORE, Plaintiff respectfully asks this Court:

- Enter judgment against Defendant for compensatory and punitive damages in an amount more than $631,085.52, plus interest, and the costs of this action; and

- Awarded punitive damages in favor of Plaintiff against Defendant in an amount to be determined at trial; and

- Grant any other such relief that it sees fit.

**COUNT VII**
**TORTS ARISING FROM BREACH OF CONTRACT**
**(Against MTA)**

90.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

91.    MTA's failure and refusal to pay Vivimetrix $631,085.52is a material breach of the Agreement.

92.    During the term within which it had access to and use of the Vivimetrix Software Service, MTA materially breached the Agreement by using the Vivimetrix Software Service and Documentation in a manner or for purposes not expressly permitted by the Agreement. MTA used the Vivimetrix Software Service to Vivimetrix's detriment or commercial disadvantage.

93.    MTA materially breached the Agreement by reverse-engineering the Vivimetrix Software Service, by its impermissible use of and access to the Vivimetrix

Software Service, and by its disclosure and dissemination of confidential information to third-parties for the purpose of developing a competing software product or service.

94.     MTA's unlawful taking of confidential intellectual property belonging solely to Vivimetrix and refusal to pay Vivimetrix for its services constitute a tortious breach of contract.

95.     MTA's intentional and malicious actions in violating the terms of the Agreement to gain unfair competitive advantage and cause injury to Vivimetrix go beyond simple breach and rise to the level of independent torts.

96.     MTA's tortious actions were only possible because of its contractual relationship with Vivimetrix that gave it access to the proprietary software.

97.     As a result of MTA's material breaches of the Agreement, Vivimetrix has suffered damages in an amount exceeding $631,085.52.

WHEREFORE, Plaintiff respectfully asks this Court:

- Enter judgment against Defendant for compensatory and punitive damages in an amount more than $631,085.52, and the costs of this action;

- Award punitive damages in favor of Plaintiff against Defendant in an amount to be determined at trial; and

- Grant any other such relief that it sees fit.

## COUNT VIII
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTION

98.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

99.     Section 26 of the Agreement provides as follows:

Equitable Relief. Each Party acknowledges and agrees that a breach of threatened breach by such Party of any of its obligations under Section 15 would cause the other Party irreparable harm for

which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity, or otherwise.

Ex. 1, §26.

100.    As described hereinabove, MTA has materially breached Section 15 of Agreement.

101.    In having executed the Agreement, MTA, and Fitzwater, in his representative capacity, explicitly admit that the breach of Section of the Agreement would cause Vivimetrix to suffer irreparable harm in the absence of equitable relief, including a restraining order and injunction.

102.    Vivimetrix has suffered irreparable injury, and it will continue to suffer irreparable injury unless an injunction is granted which enjoins MTA from using its competing software service "ProfitSight" and which otherwise enjoins Defendant and its agents, employees, assigns, and all persons acting in concert with them from disclosing or using Vivimetrix's Confidential Information.

103.    The benefits to Vivimetrix in obtaining an injunction are equal to or outweigh the potential harm which the Defendant would incur, were an injunction granted.

104.    The public interest is best served by granting an injunction.

WHEREFORE, Plaintiff respectfully asks this Court:

- That Defendant MTA and its agents, employees, assigns, and all persons acting in concert with them be permanently enjoined from using its competing software service "ProfitSight" and that Defendant be permanently enjoined from disclosing or using Vivimetrix's Confidential

Information;

- That the Court impose on Defendant a constructive trust comprised of all profits obtained by MTA's use of the "ProfitSight" service, and by virtue of Defendant's impermissible use of Plaintiff's Confidential Information;

- That Plaintiff be awarded damages, including, but not limited to, actual, special, and compensatory damages, in an amount to be determined at trial but not less than $631,085.52, plus costs, attorney's fees, and interest, against Defendant;

- That Plaintiff be awarded punitive damages against Defendant in an amount to be determined at trial;

- That the Court award Plaintiff such other and further relief as the Court may determine is appropriate.

## JURY DEMAND

Per Fed. R. Civ. P. 38, Plaintiff demands a jury for all issues able to be tried by jury.

Respectfully submitted,

_____/s/ Jan I. Berlage_____
Jan I. Berlage (23937)
Duane Demers (28543)
GOHN HANKEY & BERLAGE LLP
201 N Charles St., Suite 2101
Baltimore, Maryland 21201
(410) 752-9300
(410) 752-2519 (fax)
jberlage@ghsllp.com

*Counsel for Vivimetrix LLC*

## <u>VERIFICATION</u>

I, Aaron French, solemnly affirm under penalties of perjury that the contents of the foregoing Verified Complaint and Jury Demand are true upon my personal knowledge.

10/8/24

_____

Date Executed

_____

Aaron French